IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| KENT M. LARSON, | ) | 4:12CV3010 |
| | ) | |
| Plaintiff, | ) | MEMORANDUM AND ORDER ON |
| | ) | REVIEW OF THE FINAL DECISION OF |
| v. | ) | THE COMMISSIONER OF THE SOCIAL |
| | ) | SECURITY ADMINISTRATION |
| MICHAEL J. ASTRUE, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

On January 18, 2012, the plaintiff, Kent M. Larson, filed a complaint against the defendant, Michael J. Astrue, Commissioner of the Social Security Administration. (ECF No. 1.) Larson seeks a review of the Commissioner's decision to deny his application for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401 et seq. See 42 U.S.C. §§ 405(g) (providing for judicial review of the Commissioner's final decisions under Title II of the Act). The Commissioner has filed an answer to the complaint and a transcript of the administrative record. (See ECF Nos. 8-9.) In addition, the parties have filed briefs in support of their respective positions. (See Pl.'s Br., ECF No. 12; Def.'s Br., ECF No. 17; Pl.'s Reply Br., ECF No. 18.) I have carefully reviewed these materials, and I find that the case must be remanded to the Commissioner.

## I.   BACKGROUND

In September 2010, Larson filed an application for disability insurance benefits. (Transcript of Social Security Proceedings (hereinafter "Tr.") at 14, 54, 135.) The application was denied on initial review, (id. at 54, 65-68), and on reconsideration, (id. at 55, 72-75). Larson then requested a hearing before an ALJ. (Id. at 76-77.) The hearing was held on April 4, 2011, (e.g., id. at 28, 105), and, in a decision dated April 13, 2011, the ALJ concluded that Larson was "not under a disability . . . as defined in the Social Security Act," (id. at 23; see also id. at 14-23). Larson requested that the Appeals Council of the Social Security Administration review the ALJ's decision. (See id. at 5.)

1

This request was denied, (see id. at 1-4), and therefore the ALJ's decision stands as the final decision of the Commissioner.

## II.   SUMMARY OF THE RECORD

On a Disability Report form, Larson claimed that he became disabled on January 1, 2003, due to "Bipolar, ADD, back injury[,] . . . bad right leg[,] . . . and seasonal disorder." (Tr. at 162, 166.) He later amended his alleged onset date to January 19, 2007. (Id. at 32.) Larson was born in June 1960. (Id. at 162.) He completed the 12th grade, (id. at 167), and he has experience as a carpenter, a construction worker, an installer of speaker wire, a state parks maintenance worker, and a ranch worker, (id. at 34-37, 167, 196-201).

### A.   Medical Evidence[1]

Treatment records from Dirk B. Craft, D.O., in Wasilla, Alaska, indicate that on March 4, 2003, Larson returned for a follow-up visit complaining that his medications (i.e., Zoloft and Wellbutrin) were causing him fatigue, but Neurontin was working "well for pain." (Tr. at 249.)[2] Dr. Craft assessed "mood disorder-excessive fatigue" and "neuropathic RLE pain," and noted that Larson was "unable financially" to attend a "psych" consultation. (Id. at 248.) A "retry" of Zoloft was ordered. (Id.) Additional records dated from July 2003 to August 2004 include references to

---

[1] This review of the medical evidence emphasizes the records cited by the parties in their briefs. (See Pl.'s Br. at 2-10, ECF No. 12; Def.'s Br. at 2-6, ECF No. 17.) It includes records dating back to approximately March 2003 and continuing to the date of the hearing before the ALJ. It should be noted, however, that Larson's insured status expired on December 31, 2008. (See Tr. at 14.) See also, e.g., 20 C.F.R. § 404.130(a)-(b). Thus, to be entitled to benefits, Larson must prove that he was disabled before that date. See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006). Nevertheless, I shall consider evidence of Larson's condition outside of the insured period insofar as it bears upon Larson's condition during the relevant time. See id. ("Evidence from outside the insured period can be used in 'helping to elucidate a medical condition during the time for which benefit might be [a]warded.'" (quoting Pyland v. Apfel, 149 F.3d 873, 877 (8th Cir. 1998))).

[2] Larson's brief indicates, incorrectly, that Dr. Craft's records are from Vocational Rehabilitation in Norfolk, NE, and its citations refer to the wrong pages of the transcript. (Pl.'s Br. at 2-3, ECF No. 12 (citing Tr. at 271-275).) Indeed, it appears that nearly all of Larson's citations refer to the wrong pages of the transcript. (See id. at 3-12.)

"bipolar mood disorder," ADHD, "problems finishing projects once started," fatigue, sleep problems, irritability, depression, and medication adjustments. (Id. at 244-47.) A note dated May 8, 2006, indicates that Larson was feeling depressed, sleeping poorly, and experiencing loss of motivation and energy. (Id. at 243.) The same note assesses Larson with "bipolar," "ADD," and "smokers syndrome."

Stephen J. O'Neill, M.D., consulting psychiatrist at Heartland Counseling Services, Inc. in O'Neill, Nebraska, conducted an initial psychiatric assessment of Larson on January 19, 2007, which is the amended alleged onset date. (Id. at 287-89; see also id. at 32.) Larson said that "it seems he has been depressed all of his life," adding that he began treatment for depression approximately five years ago in Alaska. (Id. at 287.) Larson also reported that in the past he suffered bad dreams that were "predictive" and "tend[ed] to be negative," and these dreams recently "came back" because he was unable to afford his medication. (Id.) He said he "has had thoughts at times about faking his own death and disappearing," and he "had one suicide attempt in which he drank some toxic wood treatment product." (Id.) He had never been hospitalized for psychiatric illness, and although he had been treated with medication, he had not been to counseling until recently. (Id.) Larson had six surgeries on his right leg following a motorcycle accident in 1988. (Id. at 288.) Dr. O'Neill's mental status exam notes state that Larson "is pleasant, cooperative, and is somewhat tense in posture"; his "[e]ye contact is fair"; "[h]e has had disturbing dreams, which he feels are predictive in nature," but he does not seem to "overtly" hallucinate; "[h]is memory and concentration were grossly intact"; he seemed to be of average intelligence; his affect was "somewhat dysphoric and constricted"; his mood was "somewhat down"; his insight was fair; his judgment "has been impaired at times"; and although he had a suicide attempt last April, he now denies thoughts of suicide. (Id.) Dr. O'Neill diagnosed "Major Depression Recurrent," "Rule Out Bipolar Disorder . . . Attention Deficit Disorder . . . [and] Psychotic Disorder NOS." (Id. at 289.) He also noted "History of Mild Stroke, Hypercholesterolemia, History of Multiple Surgeries (on right leg following a motorcycle accident)," "Problems Related to Social Environment (few friends), Economic Problems, [and] Occupational Problems." (Id.) Dr. O'Neill assessed Larson's GAF to be 40-45. (Id.)[3] Larson's treatment plan

_____

[3] "The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational and psychological functioning 'on a hypothetical continuum of mental health-

3

was to "continu[e] in Community Support and individual therapy," continue to take medications, and return for a follow-up during the next month.  (Id. at 289.)

In a progress note dated February 21, 2007, Dr. O'Neill stated that Larson "has had some improvement in areas of depression and energy level," and that he has "not had problems with hypomania or manic symptoms."  (Id. at 290.)  Larson did report having disturbing dreams, and although he felt "significantly less hopeless," he sometimes "says out loud . . . he wished he were dead."  (Id.)  Larson also reported that he was "fixing his place up" and "laying new carpet and linoleum down."  (Id.)  He was to return for a follow-up in two months.  (Id.)

On March 12, 2007, Larson was seen by Paul W. Adams, Ed.D., at Heartland Counseling Services, Inc.  (Id. at 268.)  Dr. Adams noted that Larson "has had daily thoughts of suicide" and "increased confusion."  (Id.)  He also noted that Larson "was living in Alaska prior to moving to Nebraska to live with his parents due to lack of being able to care for self and keep up with his functioning ability."  (Id.)  Dr. Adams diagnosed "Major Depressive Disorder, Recurrent, Severe Without Psychotic Features, Provisional," "Bipolar, Per History," "Possible High Blood Pressure, Some Dizziness . . . Occupational Problems (Currently Unemployed), [and] Other Psychosocial and Environmental Problems (moving from Alaska to Nebraska)."  (Id.)  He assigned Larson a GAF score of 40.  (Id.).  Dr. Adams' disposition note states that Larson "will be involved in weekly outpatient mental health counseling with Roxanne O'Neill," will be "referred to Emergency Community Support," and "will also be referred to Dr. O'Neill for Medication Management."  (Id.)

Dr. O'Neill's progress note dated April 19, 2007, states that Larson continued to have disturbing dreams and wanted to try different medications.  (Id. at 291.)  Larson reported that he had been "working on some remodeling projects" and was living near his parents.  Dr. O'Neill noted that Larson's eye contact was good; he was pleasant, cooperative, and goal-directed; and that he had "no

---

illness.'" Pate-Fires v. Astrue, 564 F.3d 935, 937 n.1 (8th Cir. 2009) (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994) (hereinafter DSM-IV)).  "A GAF of 31 to 40 indicates the individual has an 'impairment in reality testing or communication . . . or [a] major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood . . . .'"  Id. (quoting DSM-IV at 32).  "A GAF of 41 to 50 indicates the individual has '[s]erious symptoms . . . or any serious impairment in social, occupational, or school functioning . . . .'"  Id. at 937 n.2 (quoting DSM-IV at 32).

pressured speech."  (Id.)  He was "a bit tense," however.  (Id.)  Dr. O'Neill made adjustments to Larson's medication regimen, directed Larson to follow up in one month, and ordered him to "continue in Community Support and individual therapy."  (Id.)  Larson's GAF score was "about 45-50."  (Id.)

On May 21, 2007, Larson reported to Dr. O'Neill that he was continuing to have problems with sleep, but he had not been having "vivid dreams . . . or any other hallucinatory-like experience[s]."  (Id. at 292.)  Dr. O'Neill noted that Larson "was polite, calm, pleasant, a bit reserved . . . [and] slightly restricted in affect."  (Id.)  Larson was also "walking and exercising daily and keeping busy with ranch work."  (Id.)  Dr. O'Neill assigned Larson a GAF of "about 45-50" and made adjustments to his medications.  (Id.)

On July 25, 2007, Larson reported that his new medication regimen was "doing a better job for his symptoms."  (Id. at 293.)  More specifically, he was "not having as many problems with vivid dreams," and he felt that "his energy level and concentration level [had] been relatively good."  (Id.)  Dr. O'Neill noted that Larson "was calm, pleasant, [and had] no pressured speech," and his "affect was euthymic."  (Id.)  He also noted that Larson had been "doing cattle work and has been mowing hay for neighbors when it has been [too] hot," and that he would be "moving back to Alaska for at least 5 months."  (Id.)  Dr. O'Neill continued Larson's medication regimen, directed Larson to return for a follow-up in January or February, and assigned a GAF of "about 50."  (Id.)

Larson next saw Dr. O'Neill on November 12, 2007, after his return from Alaska.  (Id. at 294.)  Larson reported that he spent time fixing up his house before selling it to his daughter's boyfriend, and he was "having some problems with some muscle soreness."  (Id.)  He added that he was "back helping out on the ranch" and was "considering fixing up some homes with his brother and reselling them."  (Id.)  Larson had not been having problems with "vivid dreams," and he inquired about altering his medications.  (Id.)  Dr. O'Neill noted that Larson was "calm, pleasant and goal-directed," but his affect "was slightly constricted."  (Id.)  Adjustments were made to Larson's medications, and Larson was directed to follow up in December.

On December 14, 2007, Larson reported to Dr. O'Neill that he was "significantly less depressed."  (Id. at 295.)  He said that he sometimes feels "on the verge of crying," but he described this as "a good thing."  (Id.)  He added that he was "helping out on the ranch."  (Id.)  He was "calm,

5

pleasant, [and] goal-directed," and he had no "pressured speech," "flight of ideas," or "psychotic thought processes." (Id.) Also, Larson was "tolerating the medications well and [was] pleased about how things are going." (Id.)

Larson followed up with Dr. O'Neill on March 20, 2008. (Id. at 296.) Larson reported "more depression and anxiety," which he believed were "situational." (Id.) Specifically, Larson said that his father had been diagnosed with a delusional disorder and that there had been "some question among family members about what do to with the ranch." (Id.) Larson added that he "increased his Prozac . . . on his own to feel numb." (Id.) Also, Larson said that he has a new Community Support Worker because he developed romantic feelings toward his previous one. (Id.) He acknowledged having suicidal thoughts, but said that he "would never act on them because he feels that it is a sin." (Id.) Dr. O'Neill made adjustments to Larson's medications, directed him to follow up during the next month, and assigned a GAF of 30-35. (Id.)

On April 24, 2008, Larson reported that he "has been a bit better . . . from a depression standpoint," but he "still has had chronic feelings of wanting to die," which had been with him "as long as he can remember." (Id. at 297.) Dr. O'Neill noted the Larson's affect was constricted, made adjustments to Larson's medications, and directed Larson to continue in Community Support and to return for a follow up in May. (Id.)

On June 19, 2008, Larson reported "that things have been kind of up and down, but they have been on the upswing the last few weeks." (Id. at 298.) Larson was doing roofing and some other projects on his cousin's house, and he was pleased about "working with Vocational Rehab." (Id.) He was still "having some dreams," and Dr. O'Neill made adjustments to Larson's medications. Dr. O'Neill also noted that Larson would continue in individual therapy and in Community Support. (Id.)

Larson followed up with Dr. O'Neill on August 28, 2008, and reported "feeling somewhat drugged by the increase" in one of his medications that was ordered "when he had a dream and took off and drove to Omaha." (Id. at 299.) Larson said that this dream was "about not being able to breath[e]," and it appears that the dream "continued while he was awake, on all fours in his bed." (Id.) Larson then "felt he had to leave," and "[h]e ended up driving to Omaha, even though his brother was expecting him in Neligh to help move." (Id.) Larson explained that his father remains

6

delusional, that his mother would be moving to Neligh, and that Larson was "in the process of trying to move to Neligh" where he "will be in the construction business with his brother." (Id.) Larson reported taking an increased dose of one of his medications, and Dr. O'Neill discussed making the increased dose part of his regular regimen. (Id.) It appears, however, that Larson's medications were not changed. (Id.) Dr. O'Neill noted that Larson "was mildly tense, cooperative, [and] had good eye contact." (Id.)

Larson followed up with Dr. O'Neill on September 25, 2008. (Id. at 300.) He was accompanied by his Community Support Worker. (Id.) Although Larson had "a better period of functioning this last month than the previous month," his confidence was down on this particular day because "[s]omeone made a comment yesterday about his quality of work." (Id.) Dr. O'Neill noted that Larson "does not deal well with people." (Id.) Larson's attempt to purchase a house in Neligh "fell through," and Larson was "rethinking whether to remove to Neligh or not." (Id.) Dr. O'Neill also indicated that Larson "has a possible infatuation with his aunt's sister," who lives in Florida, and Larson was "wondering about just visiting her as a friend for a short period of time." (Id.) Dr. O'Neill noted that Larson had not had any manic episodes during the past month "and appears less depressed than he has been in months past." (Id.) No adjustments were made to his medications, and Larson was directed to return for a follow-up during the next month. (Id.)

Larson returned to Dr. O'Neill on October 23, 2008, and reported that he had been doing better, but he "was very sluggish for a few weeks." (Id. at 301.) Larson said that he planned to live in Florida with a woman, and Dr. O'Neill cautioned him "about taking this relationship slowly and about protecting himself financially." (Id.) Dr. O'Neill wrote that "[t]here is a question about seasonal effective component to his illness," and noted that Larson planned to move to Florida for the winter. (Id.) Larson would be "working some construction/remodeling jobs" in December and siding a house in November. (Id.) Dr. O'Neill added, however, that Larson "worked recently for three days but has felt exhausted," and that Larson was "taking a break, coinciding with the bad weather here." (Id.) Larson was "pleasant, a bit subdued in affect," and had good eye contact. (Id.) Dr. O'Neill directed him to follow up in November. (Id.)

On November 20, 2008, Larson reported that he was not having "hallucinatory experiences or manic symptoms." (Id. at 302.) He was "pleasant, bright, animated," and experiencing "no flight

7

of ideas or pressured speech." (Id.)  Most of Dr. O'Neill's treatment note describes Larson's plans to move to Florida.  Dr. O'Neill wrote,

> He is about ready to leave to Florida to be with his girlfriend.  There appears to be a romance going on.  His plan is not to return if things work out there. . . .  He will be working on getting his medications through samples and patient assistance.  It may take as long as up to six months for him to transition there.  He has to get a driver's license before he can be seen in the Mental Health Center there and it is already a two month waiting list for that.  This could take awhile.

(Id.)

The treatment note described above is the latest record cited by the parties that predates the expiration of Larson's insured status on December 31, 2008.  As I explained previously, Larson must prove that he was disabled before December 31, 2008, in order to be entitled to benefits; nevertheless, I may consider the following records insofar as they "help[] to elucidate a medical condition during the time for which benefits might be [a]warded." (See supra note 1 (quoting Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006)).)

A discharge summary from Circles of Care, Inc., in Melbourne, Florida, indicates that Larson was voluntarily admitted for hospitalization from August 24, 2009, to August 27, 2009. (Tr. at 270.) The summary states that Larson had been in Florida since November. (Id.) It continues,

> He came down from Nebraska with a girlfriend and they were living with a roommate.  He was very paranoid when he came in stating that he wanted to report his roommate to the FBI thinking that he was Muslim, very delusional thinking.  He was feeling as if he were being spied upon.  He was very paranoid. . . .
>
>         . . . He stated that [his girlfriend] did not believe in medications so he quit taking them. . . .  He stated that he had not been sleeping especially in the previous three to four days.  He admitted that he did drink about three beers the day before he was admitted because of his not sleeping, and feeling stressed out. . . .

(Id. at 270-71.)

A mental status examination was conducted upon Larson's admission. (Id. at 271.) The examination showed Larson to be "healthy appearing," calm, "moderately guarded," and anxious in mood and affect. (Id.) He made good eye contact. (Id.) He did not know the day of the week, and he could not remember the examiners' names after a few minutes, but "[h]e was oriented to place." (Id.) Larson denied suicidal or homicidal ideation and denied hearing voices, but "he admitted that

8

he had been feeling delusional." (Id.) Larson explained that "[h]e know that his negative thoughts were not real but he was feeling very stressed out by them." (Id.) The examiner noted that Larson "had become quite tense and was on the verge of agitation when discussing his delusional state, so we allowed him to end the interview." (Id.)

Larson was admitted to the facility, "placed on suicide precautions," and observed closely. (Id.) A medication regimen was started, and arrangements were made for Larson's brother to pick him up and return him to his doctor in Omaha. (Id. at 272.) Upon discharge, Larson "voiced insight into the fact that he should have never stopped his medication," and he indicated that he and his girlfriend both "learned their lesson about that." (Id.) The couple planned "to relocate back to Nebraska where he had a supportive family and support system." (Id.) Although Larson was "still a bit anxious" and "feeling a little paranoid," his condition had "improved greatly after just two days of being on the medication," and he was discharged to his brother's care. (Id.) Larson's diagnoses on discharge included "Bipolar I Disorder, Most Recent Episode Manic, Unspecified . . . Provisional Schizoaffective Disorder . . . History of Other Substance Abuse . . . [and] Recent Alcohol Abuse." (Id. at 270.) He was assigned a GAF score of 55. (Id.)

Larson returned to Circle of Care, Inc., on December 9, 2009. (Id. at 279.) It appears that Larson went to Nebraska for an unspecified period of time, but then returned again to Florida. (Id.) He reported that he was out of work, that he was living with his girlfriend, and that he needed medication. (Id.) The record also states that Larson had been admitted recently "to Harbor Pines because he was confused and delusional." (Id.) Specifically, Larson wanted to call the FBI because he felt that the man who lives with him and his girlfriend was a Muslim. (Id.) Larson was diagnosed with "Bipolar Disorder, Most Recent Episode Hypomanic," "Rule Out Schizoaffective Disorder," "Alcohol Abuse," and "High blood pressure and pain in the leg from prior motorcycle accident." (Id. at 281.) His GAF was 65. (Id.)

On July 29, 2010, Larson visited Dr. O'Neill along with his Community Support worker. (Id. at 303.) Larson reported that he "has been down to Florida a couple of times in the last month to see his girlfriend." (Id. at 303.) Larson hoped to spend the winter in Florida and have her spend the summer in Nebraska. (Id.) He had been "doing some painting jobs for cousins and friends," and he had been "helping out some with his father's ranch chores as well." (Id.) Larson was pleasant

9

and goal-directed, and he "looked relaxed." (Id.)  He was prescribed medication, directed to continue Community Support to work on self esteem issues, and scheduled for a follow-up in two months. (Id.)

Larson visited Dr. O'Neill again on September 23, 2010. (Id. at 305.)  Larson, who was accompanied by his Community Support Worker, reported that he was less irritable, that his phone calls with his girlfriend were "going smoother," and that a new medication has helped his mood. (Id.)  His medications were continued, and he was directed to follow up in November. (Id.)

Jerry Reed, M.D., completed a "case analysis" form on November 3, 2010. (Tr. at 306.)  It appears that Dr. Reed reviewed the medical evidence, noted that Larson "has not sought any medical treatment for [his] leg," and concluded that "[t]here is no reason to think that he was not able to stand on the leg in view of his ranching activities." (Id.)  Although the form indicates that Dr. Reed's assessment was a "current evaluation," he opines that Larson's leg impairment was not severe prior to the date last insured (December 31, 2008). (Id.)  Gerald Spethman, M.D., completed a case analysis form on December 14, 2010. (Id. at 325.)  Like Dr. Reed, Dr. Spethman concluded that "the evidence does not establish a severe physical impairment" prior to the date last insured. (Id.)

On November 4, 2010, Patricia Newman, Ph.D., completed a "psychiatric review technique" form. (Id. at 302-322.)  Dr. Newman indicated that Larson suffered from an "affective disorder" (specifically, Bipolar Disorder), but his impairment was "not severe." (Id. at 308, 311.)  She also indicated that Larson's "mental disorder" mildly restricted his "activities of daily living," caused mild "difficulties in maintaining social functioning," and caused mild "difficulties in maintaining concentration, persistence, or pace." (Id. at 318.)  She opined that there was insufficient evidence to assess the frequency of Larson's "episodes of decompensation." (Id.)  Dr. Newman's "consultant's notes" indicate that in completing the form, she reviewed records dating from August 1, 2001, through July 2010, including Dr. O'Neill's progress notes and the records from Larson's voluntary hospitalization in August 2009. (Id. at 320.)  Glenda L. Cottam, Ph.D., reviewed the evidence in the record and affirmed Dr. Newman's assessment on December 14, 2010. (Id. at 323.)

Larson visited Dr. O'Neill on November 11, 2010. (Id. at 336.)  Once again, he was accompanied by his Community Support Worker. (Id.)  Larson's "main concern" was "not having much energy." (Id.)  He reported that he was sleeping approximately eleven hours per day and that

10

he was not able to concentrate.  (Id.)  He also reported that he would not be visiting his girlfriend in Florida because she was expressing reluctance about him visiting.  (Id.)  On December 10, 2010, Larson reported that his new medication was helping to improve his concentration and attention span.  (Id.)  He was not having "hallucinatory experiences," but he was sleeping about twelve hours per day, and he did "not have that much to keep him busy."  (Id.)

On January 18, 2011, Jean Hunt, LMHP, LADAC, completed a "mental impairment evaluation" form.  (Id. at 328-330.)  Ms. Hunt indicated that she began treating Larson on June 9, 2010, and sees him on a regular basis.  (Id. at 328.)  Ms. Hunt wrote that Larson's bipolar disorder and psychosis "came to the attention of this agency" on December 4, 2006, and the form states that the "evaluation period" extends from January 19, 2007, to the present.  (Id.)  Nevertheless, it is not clear whether most of Ms. Hunt's responses relate to the period during which she treated the claimant (which falls beyond the expiration of Larson's insured status), the "evaluation period" indicated on the form, or some different period.  In any event, Ms. Hunt indicated that Larson's impairments cause him to be unable to perform his previous job or other similar work; that a "repair job of several days duration" was "probably do-able" for Larson, but "[b]uilding a house" was "not do-able"; that Larson was hospitalized on May 22, 2010, for "wearing inappropriate attire," suffering a "sleep disturbance," and expressing a "[b]elief that he was Al Quida [sic] target/operative and FBI informant"; and that medication results in "modest" improvement in Larson's symptoms. (Id. at 328-329.)  Ms. Hunt also indicated that Larson's condition had improved since she began treating him, opined that his prognosis was fair, and described the symptoms and signs of Larson's impairment. (Id. at 329-330.)  Finally, Ms. Hunt evaluated Larson's capabilities and limitations across a range of mental capacities, and she opined that he could work "0-3 days per week" under "optimal conditions."  (Id. at 331-334.)

On March 29, 2011, Dr. O'Neill completed a form titled "Medical Statement of Ability to Do Work-Related Activities (Mental)."  (Id. at 337-339.)  On the form, Dr. O'Neill indicated that Larson's abilities to deal with the public, to deal with work stresses, to maintain attention and concentration, to understand, remember, and carry out complex or detailed instructions, to behave "in an emotionally stable manner," and to relate predictably in social situations were all poor.  (Id. at 338-339.)  Dr. O'Neill wrote that his assessment was supported by evidence that Larson was

sometimes delusional, was suspicious of others, had "possible poor boundaries with women," had concentration difficulties, was sometimes disheveled, and lacked energy. (Id.)   It is not clear, however, whether Dr. O'Neill's assessment describes Larson's abilities prior to the expiration of Larson's insured status on December 31, 2008.

Also on March 29, 2011, Dr. O'Neill completed a form titled "Mental Impairment Evaluation." (Id. at 340-346.)  On this form, Dr. O'Neill indicated that Larson has suffered from "Schizoaffective Disorder" since 2002, that this impairment was severe, and that this impairment rendered Larson unable to perform his "previous job or some other similar work." (Id. at 340.)  Dr. O'Neill also indicated that Larson's impairment would be adversely affected if he were to perform his former job or other similar work; that Larson would have difficulty working under supervision due to his suspicions and delusions; and that Larson might "interact inappropriately with female coworkers thinking there is a romance when there isn't." (Id.)  Dr. O'Neill opined that Larson's condition "has stayed about the same" during the course of their treatment relationship, that his condition "frequently" interferes with attention and concentration, that his energy is low, that Larson feels depressed, and that he has been suspicious and delusional. (Id. at 341-342.)  In addition, Dr. O'Neill opined that Larson's abilities to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others without being distracted by them, to complete a normal workday and workweek at a consistent pace, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, and to set realistic goals or make plans independently of others were markedly limited. (Id. at 343-345.)  Dr. O'Neill wrote, "Patient would need to have employment not closely supervised and not near coworkers much.  Likely would have to have simple instructions and limited hours due to fatigue." (Id. at 346.)  The form indicates that Dr. O'Neill's evaluation covers the time between January 19, 2007, to the present (i.e., March 29, 2011). (Id. at 340.)

### B.    Larson's Testimony

During the hearing before the ALJ on April 4, 2011, Larson testified that he was born in June 1960 and had completed the twelfth grade. (Tr. at 34.)  He said that his current sources of income were "[f]amily" and "a house that [he] rent[s] out in Alaska." (Id.)  He has a valid driver's license,

12

and he drives ten miles every day.  (Id.)  His last job was part-time maintenance work for Alaska State Parks, which he held for approximately three months.  (Id. at 33-34.)  He also performed construction work in 2007 for approximately four months, and he performed residential carpentry work in Alaska "off and on for probably 10 years."  (Id. at 36.)  He installed speaker wires for approximately five months, and he has performed seasonal ranch work since he was a child.  (Id. at 36-37.)  His ranch work included baling hay, attempting to fix fences, and picking up tree limbs, and he performed this for approximately forty hours per week during the summertime.  (Id. at 37.)

When asked to specify the physical problems that keep him from working at the present time, Larson responded that his medicine causes him "extreme fatigue," and he added that his leg bothers him "if there's a lot of walking."  (Id. at 38.  See also id. at 47 (stating that vivid dreams also affect Larson's sleep and cause fatigue).)  When asked about the mental problems that keep him from working, Larson testified that he has difficulty getting along with coworkers, concentrating, and completing tasks.  (Id. at 39.  See also id. at 45.)  He added that he does not handle criticism well, and that he becomes "stressed over things that [he] shouldn't."  (Id. at 45-46.)  He sees a counselor once per week and a second counselor every two weeks, and he said that his counseling and medication help him.  (Id. at 39-40.)

Larson testified that he does not read because he "can't concentrate long enough to read a paragraph."  (Id. at 40.)  He has recently started to watch the news, which used to make him feel depressed, but otherwise he does not watch television.  (Id.)  He added that he has problems remembering things.  (Id. at 40-41.)  He visits friends approximately every other day, and he visits family every day.  (Id. at 41.)  Larson said that on a typical day,  he cuts firewood, walks fence lines, and picks up branches.  (Id. at 41.)  He does this work alone, for his family, and he receives approximately $100 per week.  (Id. at 43.)  He added that his family does not expect him to work if he has "a bad day."  (Id. at 44.)  He said that he has some problems shaving and brushing his teeth, but he can do some cooking, and he is able to do many household chores when reminded to do them.  (Id. at 42, 44-45.)  He does not go out to eat very often because he "get[s] nervous being around a lot of people," and he does not go to movies or sporting events.  (Id. at 43.)  His community support worker helps him clean his house, keep groomed, and remain focused on tasks.  (Id. at 44.)

13

## C.    The Vocational Expert's Testimony

The ALJ asked a Vocational Expert (VE)[4] to "assume an individual who's restricted to medium work; and simple, unskilled work with an SVP: 1 or 2; and requires only minimal interaction with coworkers, minimal contact with and direction from a supervisor; brief and superficial contact with the general public; routine low-stress work that does not involve significant changes or adaptations," and asked whether this individual could "do any of the claimant's past relevant work as he performed it or as it's customarily performed."  (Tr. at 49-50.)  The VE responded in the negative.  (Id. at 50.)  Without being asked another question, the VE then testified that "there would be jobs that he would be able to . . . do that . . . are SVP . . . 1 or 2, and would have minimum supervision; coworkers contact, brief and superficial contact."  (Id.)  The VE identified "production assembler," "hand packager," and "housekeeping cleaner" as jobs that would "meet with all those stipulations," although he noted that a "housekeeping cleaner" "would have a supervisor giving you brief directions periodically," "would work largely independently," and would "occasionally coordinate with a coworkers [sic]."  (Id. at 50-51.)

Larson's attorney asked the VE whether an individual who had the limitations identified by Dr. O'Neill in his March 29, 2011, assessment (specifically, poor abilities to deal with the public; to deal with work stresses; to maintain attention and concentration; to understand, remember, and carry out either complex or detailed instructions; to behave in an emotionally stable manner; and to relate predictably in social situations) would be able to do any work in the national economy.  (Id. at 52.)  The VE responded that such an individual "would not be able to function at all."  (Id.)

## D.    The ALJ's Decision

An ALJ is required to follow a five-step sequential analysis to determine whether a claimant is disabled.  See 20 C.F.R. § 404.1520(a).  The ALJ must continue the analysis until the claimant is found to be "not disabled" at steps one, two, four or five, or is found to be "disabled" at step three or step five.  See id.  In this case, the ALJ found Larson to be not disabled at step five.  (See Tr. at 22-23.)

---

[4] The hearing transcript identifies the VE as Dale Lenhart, (e.g., Tr. at 28), while the ALJ's decision identifies the VE as Gail F. Leonhardt, (id. at 14).

Step one requires the ALJ to determine whether the claimant is currently engaged in substantial gainful activity.  See 20 C.F.R. § 404.1520(a)(4)(i), (b).  If the claimant is engaged in substantial gainful activity, the ALJ will find that the claimant is not disabled.  See id.  In the instant case, the ALJ found that Larson "did not engage in substantial gainful activity during the period from his alleged onset date of January 1, 2003, through his date last insured of December 31, 2008."  (Tr. at 16 (citation omitted).)[5]

Step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. § 404.1520(c).  A "severe impairment" is an impairment or combination of impairments that significantly limits the claimant's ability to do "basic work activities" and satisfies the "duration requirement."  See 20 C.F.R. § 404.1520(a)(4)(ii), (c); id. § 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months.").  Basic work activities include, inter alia, "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations"; and "[d]ealing with changes in a routine work setting."  20 C.F.R. § 404.1521(b).  If the claimant cannot prove such an impairment, the ALJ will find that the claimant is not disabled.  See 20 C.F.R. § 404.1520(a)(4)(ii), (c).  Here, the ALJ found that Larson had the following severe impairments through the date last insured: "[a]ttention deficit hyperactivity disorder (ADHD), depression, and bipolar disorder."  (Tr. at 16 (citation omitted).)

Step three requires the ALJ to compare the claimant's impairment or impairments to a list of impairments.  See 20 C.F.R. § 404.1520(a)(4)(iii), (d); see also 20 C.F.R. Part 404, Subpart P, App'x 1.  If the claimant has an impairment "that meets or equals one of [the] listings," the analysis ends and the claimant is found to be "disabled."  See 20 C.F.R. § 404.1520(a)(4)(iii), (d).  If a claimant does not suffer from a listed impairment or its equivalent, then the analysis proceeds to steps four and five.  See 20 C.F.R. § 404.1520(a).  The ALJ found that through the date last insured,

---

[5] The ALJ considered Larson's alleged onset date to be January 1, 2003, (see Tr. at 14, 16), though Larson amended his alleged onset date to January 19, 2007, during the hearing, (see id. at 32).

Larson "did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (Tr. at 17 (citations omitted).)

Step four requires the ALJ to consider the claimant's residual functional capacity (RFC)[6] to determine whether the impairment or impairments prevent the claimant from engaging in "past relevant work." See 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f). If the claimant is able to perform any past relevant work, the ALJ will find that the claimant is not disabled. See 20 C.F.R. § 404.1520(a)(4)(iv), (f). The ALJ concluded that through the date last insured, Larson "had the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except he was limited to simple and unskilled work with an SVP of one or two. The work must have required only minimal interaction with coworkers and supervisors, minimal interaction with a supervisor, and only brief and superficial contact with the general public. The work must have been routine and low stress and must not have involved significant changes or adaptations." (Tr. at 18-19.) The ALJ also concluded that through the date last insured, Larson "was unable to perform any past relevant work." (Id. at 21 (citation omitted).)

Step five requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can do work other than that which he or she has done in the past. See 20 C.F.R. § 404.1520(a)(4)(v), (g).[7] If the ALJ determines that the claimant cannot do such work, the claimant will be found to be "disabled" at step five. See 20 C.F.R. § 404.1520(a)(4)(v), (g). The ALJ wrote, "Based on the testimony of the vocational expert, the undersigned concludes that, through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, the claimant was capable of making a successful adjustment to other work that existed in significant numbers in the national economy."

---

[6] "'Residual functional capacity' is what the claimant is able to do despite limitations caused by all of the claimant's impairments." Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)).

[7] "Through step four of this analysis, the claimant has the burden of showing that she is disabled." Steed v. Astrue, 524 F.3d 872, 874 n.3 (8th Cir. 2008). After the analysis reaches step five, however, "the burden shift[s] to the Commissioner to show that there are other jobs in the economy that [the] claimant can perform." Id.

(Tr. at 23.)  Specifically, Larson "would have been able to perform the requirements of representative occupations such as . . . Production assembler . . . Hand packager . . . [and] Housekeeping cleaner." (Id. at 22.)  The ALJ concluded, therefore, that Larson was not under a disability at any time between January 1, 2003, and December 31, 2008.  (Id. at 23.)

## III.   STANDARD OF REVIEW

I must review the Commissioner's decision to determine "whether there is substantial evidence based on the entire record to support the ALJ's factual findings."  Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997) (quoting Clark v. Chater, 75 F.3d 414, 416 (8th Cir. 1996)). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion."  Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008) (citations and internal quotation marks omitted).  A decision supported by substantial evidence may not be reversed, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome."  McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010). Nevertheless, the court's review "is more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp' of the Commissioner's action."  Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (citations, brackets, and internal quotation marks omitted).  See also Moore v. Astrue, 623 F.3d 599, 602 (8th Cir. 2010) ("Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision.").

I must also determine whether the Commissioner's decision "is based on legal error."  Lowe v. Apfel, 226 F.3d 969, 971 (8th Cir. 2000).  No deference is owed to the Commissioner's legal conclusions.  See Brueggemann v. Barnhart, 348 F.3d 689, 692 (8th Cir. 2003).

## IV.   ANALYSIS

Larson argues that the Commissioner's decision must be reversed because 1) the ALJ failed to give controlling weight to the opinions of Dr. O'Neill, who was Larson's treating psychiatrist; 2) the ALJ filed to give due weight to Dr. O'Neill's opinions, assuming they are not entitled to

17

controlling weight; 3) "the ALJ did not give proper consideration to the opinions of the plaintiff's therapist, Ms. Jean Hunt"; and 4) the ALJ did not properly assess the credibility of Larson's testimony.  (Pl.'s Br. at 13-14, ECF No. 12.  See also id. at 15-26.)  I shall analyze each of his arguments in turn.

**A.    Whether the Treating Psychiatrist's Opinions Are Entitled to Controlling Weight**

Larson argues first that the ALJ erred by failing to give controlling weight to Dr. O'Neill's opinions.  (See Pl.'s Br. at 15-20, ECF No. 12; Pl.'s Reply Br. at 1-4, ECF No. 18.)

"The Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations."  McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000).  See also 20 C.F.R. § 404.1545.  Nevertheless, "[b]ecause a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace."  Perks v. Astrue, 687 F.3d 1086, 1092 (8th Cir. 2012) (quoting Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007)).  When considering the medical evidence, the Commissioner will give a treating source's opinion about the nature and severity of a claimant's impairment "controlling weight" if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2).  See also SSR 96-2p, 1996 WL 374188, at *2 (July 2, 1996).  Conversely, "[a]n ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions."  Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Perkins v. Astrue, 648 F.3d 892, 897-98 (8th Cir. 2011)).

The ALJ's decision includes the following discussion of Dr. O'Neill's opinions:

> Dr. O'Neill completed a medical statement of ability and mental impairment evaluation in March 2011.  He diagnosed schizoaffective disorder and opined that the claimant would be unable to perform his previous jobs and would have difficulty working due to his suspicious and paranoid traits.  The undersigned gives his opinion little weight because his opinion is inconsistent with his treatment notes that indicated the claimant was well enough to perform all sorts of contractor type jobs, travel to Alaska and Florida, and fix up and sell a home and consider buying another.

18

The last note before the date last insured was that the claimant appeared to be maintaining his level of functioning.

(Tr. at 20 (citations omitted).)

It is true that Dr. O'Neill's treatment records state that Larson engaged in various "contractor type jobs," i.e., "fixing his place up" by "laying new carpet and linoleum" in approximately February 2007; "working on some remodeling projects" in approximately April 2007; "fixing up his house before selling it" in approximately November 2007; and "doing roofing and some other projects on his cousin's house" in approximately June 2008. (Tr. at 290-291, 294, 298.)  The records also indicate, however, that Larson generally performed these tasks for himself or for family members, and he worked alone or with help from family members. (See id.)  Also, the records show that some of these projects left Larson "exhausted" or sore. (Id. at 294, 301).  Moreover, there is no indication that Larson performed these sorts of jobs on a sustained basis.  Although the treatment notes include two references to Larson's plans to join with his brother in a construction or remodeling business, these plans never came to fruition. (Id. at 294, 299-300.)  In any case, I do not see how the "contractor type jobs" described in Dr. O'Neill's treatment notes are inconsistent with Dr. O'Neill's "Mental Capacities Evaluation." (Id. at 343-346.)  Nor do I see how these jobs contradict Dr. O'Neill's opinions that Larson "would need to have employment not closely supervised and not near coworkers," and that he "[l]ikely would have to have simple instructions and limited hours." (Id. at 346.)[8]

It is also true that Larson traveled to Alaska and Florida during the relevant time period.  However, a medical record dated March 12, 2007, shows that Larson returned to Nebraska from Alaska "to live with his parents due to lack of being able to care for [him]self and keep up with his functioning ability." (Tr. at 268.)  Similarly, Larson's move to Florida resulted in at least one hospitalization, (id. at 270-273, 279), and ended with Larson returning to Nebraska to be near his

---

[8] Dr. O'Neill's records also mention that Larson performed "ranch work" for his family, (see, e.g., Tr. at 292-295), but I do not see a contradiction between the references to this work and Dr. O'Neill's opinions about the limiting effects of Larson's mental impairments.  This is especially so given Larson's testimony that his family accommodated his "bad day[s]" and allowed him to work alone. (See id. at 43-44.)

family.  I see no inconsistency between these events and Dr. O'Neill's evaluation of Larson's mental capabilities.

Finally, Dr. O'Neill's treatment note of November 20, 2008, does state that Larson "appears to be maintaining his level of functioning."  (Tr. at 302.)  There is no indication, however, that Larson was maintaining a level of functioning inconsistent with Dr. O'Neill's opinions about Larson's mental capabilities.

In summary, Dr. O'Neill did not render "inconsistent opinions that undermine the credibility of such opinions."  Renstrom, 680 F.3d at 1064 (quoting Perkins, 648 F.3d at 897-98).  On the contrary, while Dr. O'Neill's progress notes from the relevant period acknowledge Larson's construction work, ranch work, and travels, they also cite symptoms, limitations, and GAF scores consistent with the opinions set forth on Dr. O'Neill's March 2011 evaluation forms.  It appears to be undisputed that Dr. O'Neill's opinions were "well-supported by medically acceptable clinical . . . diagnostic techniques."  Id.; see also 20 C.F.R. § 404.1527(c)(2).  Furthermore, the ALJ cites no opinions from any treating or examining source that conflict with the opinions of Dr. O'Neill.  The ALJ relies heavily on the opinions of Drs. Newman and Cottam, but these consultants did not examine Larson.  Instead, they formed their opinions after merely reading the records on file, including those of Dr. O'Neill.  (Tr. at 20, 308-323.)  Under the circumstances, the opinions of Drs. Newman and Cottam do not constitute substantial evidence.  See Lauer v. Apfel, 245 F.3d 700, 705 (8th Cir. 2001) ("Generally, even if a consulting physician examines a claimant once, his or her opinion is not considered substantial evidence, especially if, as here, the treating physician contradicts the consulting physician's opinion.").  Dr. O'Neill's opinions are entitled to controlling weight.

The Commissioner argues that Dr. O'Neill's opinions are inconsistent with his own treatment records because the "treatment records showed that [Larson] consistently performed activities that would be impossible for a person with the limitations Dr. O'Neill described: [Larson] worked as a ranch hand for his parents, installed flooring and carpeting in his house in Nebraska, traveled to another state for five months to fix up and sell a house, mowed hay for neighbors, worked on various remodeling projects for others, and moved to another state to pursue a relationship."  (Def.'s Br. at 16, ECF No. 17 (citations omitted).)   The record does not show that Larson performed these

activities "consistently," nor am I persuaded that it would be "impossible" for Larson to work on the projects described in the record given the limitations that Dr. O'Neill identified in his treatment notes and evaluation forms. Also, it seems to me that the aftermath of Larson's move to Florida supports, rather than undermines, Dr. O'Neill's opinions.

The Commissioner also argues that Dr. O'Neill's treatment notes of September and October 2008 "indicate [Larson] was functioning better, had no manic episodes and appeared less distressed." (Def.'s Br. at 16, ECF No. 17.) The Commissioner adds that "in November 2008, [Larson] appeared to be maintaining his level of functioning." (Id. (citations omitted).) The Commissioner's description of these records is incomplete. Notably, the records state that Larson was not sleeping well, lacked confidence due to criticism of his work, was "sluggish," was suffering from incontinence, and was taking a break from remodeling jobs due to exhaustion. (Tr. at 300-301.) In addition, it merits mention that these records are preceded by a treatment note dated August 28, 2008, stating that Larson "took off and drove to Omaha" in response to a vivid dream, suffered a second vivid dream, and was experiencing "additional stress" about his father's delusions. (Tr. at 299.) It also merits mention that these records immediately precede Larson's move to Florida, which culminated in his voluntary hospitalization from August 24-27, 2009, due to paranoid delusions. (Id. at 270-273.) I am not persuaded that Dr. O'Neill's records of September through November 2008 undermine his opinions about the limiting effects of Larson's mental impairments.

The Commissioner submits that "[a]lthough the ALJ assigned Dr. O'Neill's opinion little weight, the ALJ's residual-functional-capacity finding tracked Dr. O'Neill's assessment in important respects." (Def.'s Br. at 17. ECF No. 17.) Specifically, the Commissioner argues that the ALJ accounted for Dr. O'Neill's findings that Larson was "markedly limited at understanding and carrying out detailed instructions," was "markedly limited at interacting with the public and supervisors, and was moderately limited at interacting with coworkers" because she limited Larson "to simple, unskilled, routine, low-stress work" with minimal contact with coworkers, supervisors, and the public. (Id.) It is fair to say that the ALJ's RFC assessment incorporates some of the same types of limitations that were identified by Dr. O'Neill. Nevertheless, the VE testified that a person with the RFC specified by the ALJ would be capable of work, but a person with the limitations

21

described by Dr. O'Neill would not be employable. (Tr. at 49-52.) It is therefore quite clear that the ALJ's RFC finding differs from Dr. O'Neill's assessment in critical respects.

Finally, the Commissioner argues that "the ALJ could not give any weight to Dr. O'Neill's opinion that [Larson] was disabled," because "a finding of disability is one reserved for the Commissioner." (Def.'s Br. at 16-17, ECF No. 17 (citing, inter alia, Robson v. Astrue, 526 F.3d 389, 393 (8th Cir. 2008)).) Although Dr. O'Neill did not offer this particular opinion, the Commissioner's point is well-taken. The issue at hand, however, is whether the ALJ erred by giving "little weight" to Dr. O'Neill's opinions under the circumstances presented here. I find that it was erroneous for the ALJ to discount Dr. O'Neill's opinions; indeed, the ALJ's reasons for declining to give them controlling weight lack support in the record. The Commissioner's decision must therefore be reversed.

### B.   Whether the Treating Psychiatrist's Opinions Are Entitled to Great Weight in Accordance with 20 C.F.R. § 404.1527(c)

As noted above, Larson argues that even if Dr. O'Neill's opinions are not entitled to controlling weight, they are owed relatively great weight given the length of the treatment relationship, the frequency of treatment, and the fact that Dr. O'Neill is a specialist in psychiatry. (See Pl.'s Br. at 21, ECF No. 12.) See also 20 C.F.R. § 404.1527(c). I agree with Larson that these factors indicate that Dr. O'Neill's opinions are entitled to relatively great weight. More significantly, however, the ALJ's reasons for declining to give controlling weight to Dr. O'Neill's opinions are not supported by the record, and thus a remand is in order.

### C.   Whether the ALJ Failed to Give Proper Consideration to the Opinions of Larson's Therapist

Larson argues next that the ALJ erred by failing to give due consideration to the opinions of Jean Hunt, Larson's therapist. (Pl.'s Br. at 22-24, ECF No. 12.)

There is no dispute that Hunt is not an "acceptable medical source" within the meaning of the Social Security regulations. See Lacroix v. Barnhart, 465 F.3d 881, 885-86 (8th Cir. 2006); 20 C.F.R. § 404.1513(a), (d)(1). (See also Pl.'s Br. at 22, ECF No. 12.) Thus, she cannot be deemed a "treating source," and her opinions are not entitled to controlling weight. Lacroix, 465 F.3d at 885-86. Nevertheless, she is an "other source" whose opinions may be considered to show "the severity

of [Larson's] impairment and the effect of the impairment on [his] ability to work."  Id. at 887; see also 20 C.F.R. § 404.1513(d).

The ALJ explained that she gave Ms. Hunt's opinions little weight because Ms. Hunt "did not treat [Larson] before the date last insured, she is not an acceptable medical source, and the record does not contain treatment notes to support her opinion."  (Tr. at 20.)  This decision was not erroneous.  Ms. Hunt indicated that she did not begin therapy with Larson until June 9, 2010, which is well after the expiration of Larson's insured status.  (Tr. at 328.)  Although she noted that Larson's diagnoses "came to the attention of this agency" on December 4, 2006, there is no indication that any of Ms. Hunt's opinions relate to Larson's condition prior to December 31, 2008.  In addition, the record includes no treatment notes describing Ms. Hunt's therapy sessions with Larson.  Thus, it cannot be determined whether Ms. Hunt's opinions are supported by, or are consistent with, any evidence in the record.  In short, I doubt both the relevance of and foundation for Ms. Hunt's opinions, and the ALJ did not err by affording little weight to those opinions.

Larson argues that pursuant to SSR 06-03p, 71 Fed. Reg. 45593-03 (Aug. 9, 2006), Ms. Hunt's opinions should have been evaluated and weighed based on the length of her involvement with Larson, the frequency that she saw him, the consistency between her opinion and other evidence, the degree to which she presents relevant evidence to support her opinion, the strength of her explanation of her opinion, the relationship between her expertise and Larson's impairment, and other factors that tend to support or refute her opinion.  (Pl.'s Br. at 23, ECF No. 12 (quoting Sloan v. Astrue, 499 F.3d 883, 889 (8th Cir. 2007)).)  He adds that Ms. Hunt's opinions "closely parallel" Dr. O'Neill's opinions, (see id. at 23-24), which favors affording some weight to Ms. Hunt's assessment.  As I have noted, however, Ms. Hunt's opinions are not supported by relevant evidence, and her involvement with Larson did not occur during the relevant time period.  Under these circumstances, it was appropriate to give little weight to Ms. Hunt's opinions.

### D.   Whether the ALJ Properly Assessed Larson's Credibility

Finally, Larson argues that the ALJ erred by discrediting his testimony.  (Pl.'s Br. at 24-26, ECF No. 12.)

"The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts."  Moore v. Astrue, 572 F.3d 520, 524 (8th Cir. 2009) (quoting Holmstrom v. Massanari,

23

270 F.3d 715, 721 (8th Cir. 2001)).  "In assessing a claimant's credibility, the ALJ must consider: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the participating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints."  Id. (citing, inter alia, Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)).  "An ALJ who rejects [subjective] complaints must make an express credibility determination explaining the reasons for discrediting the complaints."  Id. (citation omitted) (alteration in original).  The ALJ need not explicitly discuss each of the foregoing factors, however.  Id. (quoting Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005)).  "It is sufficient if [the ALJ] acknowledges and considers [the] factors before discounting a claimant's subjective complaints."  Id. (quoting Goff, 421 F.3d at 791) (alteration in original).  "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so," courts "will normally defer to the ALJ's credibility determination."  Jones v. Astrue, 619 F.3d 963, 975 (8th Cir. 2010) (quoting Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010)).

The ALJ wrote,

> The undersigned finds the claimant's allegations of disability less credible because he reported that he had psychological symptoms his entire life and was able to work in spite of them until recently.  The claimant testified that he has had trouble getting along with schoolmates and coworkers his entire life.  He reported that he had felt like he wanted to die for as long as he could remember and had been depressed his entire life.  He complained of difficulty concentrating in 2003.  However, he was able to maintain employment until recently which shows that he was able to work with his mental conditions and suggests that he should be able to work.  Additionally, although earning records indicate that he has not worked since 2007 the undersigned notes that he testified that he has been working on his family ranch since then and that treatment notes report that he was performing many contracting jobs in 2007 and 2008.  A review of the claimant's work history shows that the claimant worked only sporadically prior to the alleged disability onset date which raises a question as to whether the claimant's continuing unemployment is actually due to mental impairments.

> Further, the claimant performed many complex activities between January 2007 and December 2008 including selling a house, considering buying another, considering moving back to Alaska, traveling to Alaska and Florida, planning to navigate the indigent mental health system in a new state, moving to Florida, and

24

starting a new relationship.  These activities indicate suggest [sic] the claimant's condition is less severe than alleged.

(Tr. at 21 (citations omitted).)

It is difficult to reconcile the ALJ's observation that Larson "was able to maintain employment until recently which shows that he was able to work with his mental conditions and suggests that he should be able to work" with her observation that "[a] review of [Larson's] work history shows that [Larson] worked only sporadically prior to the alleged disability onset date which raises a question as to whether [Larson's] continuing unemployment is actually due to mental impairments." (Id. (emphasis added).)  A finding that Larson "was able to maintain employment until recently" seems to undermine doubts about Larson's motivation to work.  (Id.)  Conversely, a finding that Larson "worked only sporadically prior to the alleged onset date" seems to undermine the conclusion that Larson "was able to work with his mental conditions."  (Id.)  Perhaps this tension can be explained in part by the ALJ's failure to use the amended alleged onset date of January 19, 2007, in her decision.  (Compare Tr. at 14, 16, and 23 with id. at 32.)  In any event, it was appropriate for the ALJ to infer that Larson might lack motivation to return to work, given his sporadic work history.  E.g., Fredrickson v. Barnhart, 359 F.3d 972, 976 (8th Cir. 2004).  It was also appropriate for the ALJ to conclude that Larson's work and other activities weighed against his credibility.  Cf. Harris v. Barnhart, 356 F.3d 926, 930 (8th Cir. 2004) (indicating that part time work and other daily activities were inconsistent with claim of disabling pain).

Although I find no error in the ALJ's credibility determination, the case must be remanded because Dr. O'Neill's opinions were entitled to controlling weight and should have been included in the hypothetical question presented to the VE.  See Conklin v. Barnhart, 206 F. App'x 633, 635-37 (8th Cir. 2006) (holding that ALJ properly discredited claimant's testimony, but failure to give controlling weight to treating physician's opinions required a remand).

**IT IS ORDERED** that the Commissioner of Social Security's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with the memorandum accompanying this order.

Dated January 8, 2013.

BY THE COURT

Warren K. Urbom
United States Senior District Judge